
IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| **KENNETH PATTERSON,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 1:15-CV-0121-BL |
| | § | |
| **ROBINSON DRILLING OF** | § | |
| **TEXAS, LTD.,** | § | |
| Defendant. | § | |

### REPORT AND RECOMMENDATION

The Court has under consideration Defendant's No-Evidence and Traditional Motion for Summary Judgment (doc. 21). The motion is fully briefed and ready for ruling. This action has been referred pursuant to 28 U.S.C. § 636(b) and the Second Amended Special Order No. 3-301, which became effective on April 26, 2016. After reviewing the briefing, evidence,[1] and applicable law and because the parties have not consented to have all further proceedings in this case conducted by a magistrate judge, the undersigned issues this report and recommendation; recommends that the Court grant the motion for summary judgment; and directs the Clerk of Court to reassign this case to Senior District Judge Sam R. Cummings.

### I. BACKGROUND[2]

Plaintiff commenced this action by filing a civil complaint against his former employer for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17. *See* Compl. (doc. 1) ¶ 1. He claims that Defendant has discriminated against him due to his

---

[1]Defendant has filed appendices with its summary judgment briefing. *See* App. Def.'s Mot. Summ. J. (doc. 22) [hereinafter "Def.'s App."]; App. Supp. Def.'s Reply (doc. 25) [hereinafter "Def.'s Reply App."]. Plaintiff has likewise filed an appendix. *See* App. Pl.'s Resp. (doc. 23-3).

[2]The factual background is undisputed or viewed in the light most favorable to the non-movant as required when ruling on a motion for summary judgment.

"Race (White/Non-Hispanic)." *Id.* ¶ 2. He alleges that "at all relevant times" he was an employee of Defendant. *Id.* ¶ 8. He alleges that he was initially discriminated against because of his race in October or November 2013. *Id.* ¶ 28.

On July 29, 2013, Plaintiff applied to work with Defendant as a floor hand and his application showed that he had welding training. *See* Employee Information (attached to Def.'s App. as Ex. A-1); Aff. Bomar ¶ 4 (attached to Def.'s App. as Ex. 1, doc. 22-1). Defendant is an oil and gas drilling company with operations in western Texas and competes for business with similar companies in the area. Aff. Bomar ¶ 3. Employment records show that Plaintiff was listed as a "ready hand" while he trained for CPR, first aid, and general safety from July 29, 2013, through July 31, 2013. *See* Ex. A-2. Other employment records confirm that Plaintiff commenced employment with Defendant on July 29, 2013, but also state that Plaintiff quit because of new employment on July 31, 2013. *See* Ex. A-3. Furthermore, one employment record has space to include a rehire date, but that space is blank. *See id.* Despite the training records of Defendant, Plaintiff did not actually work for Defendant as a floor hand, because during orientation Gary Plew – Defendant's welding boss – asked him to perform welding work instead. Pl.'s Dep.[3] 32. Plaintiff had his own welding truck and equipment. *Id.* 33.

Following the three days of employment with Defendant, Plaintiff sought work as a contract welder, but because he lacked required liability insurance, he initially provided contract welding services to Defendant as a subcontractor under Patrick[4] Beltran ("Beltran"), a contract welder who

---

[3]Both parties attach portions of Plaintiff's deposition to their appendices. *See* Ex. 2 attached to Def's App.; Ex. 2 attached to Pl.'s App.

[4]The record spells the name Patrick and Patric. The Court uses the more common spelling.

provided welding services to Defendant. Aff. Bomar ¶ 6; Pl.'s Dep. 41-43. Plaintiff, with Plew, approached Beltran in "the yard" after leaving Defendant's office. Pl.'s Dep. 42. In a subcontractor capacity for Beltran, Plaintiff was able to immediately start welding for Defendant even though he lacked a certificate of liability insurance. *Id.* 41-43.

Beltran would call Plaintiff, tell him that a particular rig needed welding work, and Plaintiff would drive his truck to the rig and perform the work. *Id.* 43. In general, Plaintiff and Beltran would be in different locations, but they would "work side by side together" occasionally. *Id.* 44. Plaintiff was on his own when doing welding jobs and no one supervised him. *Id.* 44, 53. While working with Beltran, Plaintiff would do welding jobs for Defendant and others, including competitors of Defendant. *Id.* 45. Plaintiff did this work for Beltran until he got his own insurance in October 2013. *Id.* 46. Even after Plaintiff got his own insurance, he would do side jobs for Beltran and other contractors. *Id.* 46-47. When Plaintiff worked under or for a contractor, he was representing them, but no one controlled how he did the job. Pl.'s Dep. 51, 53. While Plaintiff worked as a subcontractor for Beltran, Defendant received invoices from and paid Beltran. *Id.*; Aff. Bomar ¶ 6. The contractors would pay Plaintiff based on the invoice amount and he had to determine the taxes and other things that needed to be taken out. Pl.'s Dep. 52.

On October 11, 2013, Plaintiff obtained a Certificate of Liability Insurance for his welding business – KD's Welding. *See* Ex. B-1 attached to Def.'s App. Once Plaintiff obtained that certificate, he was on his own and Defendant began hiring him under his business name. Aff. Bomar ¶ 6; Pl.'s Dep. 53-55. At that point, Plew would call Plaintiff directly when Defendant had welding work for him. Pl.'s Dep. 54. Like his work as a subcontractor, no one supervised him or told him how to do the job and he used his own truck and tools. *Id.* 54-55, 61, 166, 169. No one told him

3

how to do the details of his work. *Id.* 65. He did not "get any different work," but he was paid more per hour. *Id.* 56. As KD's Welding, he performed welding services for more than Defendant and could refuse a job if he had a conflict or otherwise wanted to not take it. *Id.* 62. Although he could be fired from a particular job, no one could fire him from his own welding business. *Id.* 61. When there was no work for him, he simply would not get a call and he would not show up. *Id.* 63. He was not required to go to the yard, but he went every day because he was looking for work every day. *Id.* 77.

Through years of experience, Plaintiff developed a specialized skill in welding. *Id.* 63-64, 166. Without training or experience, an individual cannot do what a welder does. *Id.* 64. Supervisors and non-welders at a rig site would not know how to do things that a welder was hired to do. *Id.* Neither Defendant nor any contractor paid him a salary, withheld taxes, or provided insurance or retirement benefits. *Id.* 62-63. He was paid per job. *Id.* 63.

When Defendant hires contract welders like KD's Welding, it expects them to be a specialist and "able to perform tasks requiring a relatively high level of skill." Aff. Bomar ¶ 7. Defendant hired contract welders "on an as needed basis" and intended such welders to be independent contractors. *Id.* ¶¶ 8-9. Defendant did not dictate a "contract welder's schedule or timing of their breaks." *Id.* ¶ 9. It hired contract welders "on a job-to-job basis," with no guarantee of future work assignments; it did not provide annual leave or benefits, such as retirement or insurance; and it did not withhold taxes such as social security. *Id.* Welders provided their own equipment and tools, could refuse jobs or assignments, and could seek work from other companies – even competitors. *Id.*

Plaintiff had several conversations with Armelio Marquez starting just before Christmas 2013

that he considered as making him "feel like" he was terminated. Pl.'s Dep. 77-78. Near that time, Plew accused "another contract welder" and Plaintiff "of being on drugs" and Plaintiff said: "Well, then drug test us." *Id.* 78. Plaintiff "tested for them" even though "as a contractor, [he did not] have to." *Id.* 80. Plaintiff was "willing to cooperate to keep [his] work going" but that willingness to cooperate did not make him "an employee" and he was "not required to do a drug test." *Id.* Plaintiff was the only person to show for the random drug test, but he "was good on that" and "cleared [his] name." *Id.* 81.

Plaintiff and others "just quit getting rig calls or getting calls for any work." Pl.'s Dep. 85. He would show up at the yard and Plew would just say "Well, we don't have any work." *Id.* This started in approximately November 2013. *Id.* The only reason Defendant gave for no longer using him was that they had no more work. *Id.* 117.

Defendant filed the instant motion for summary judgment on August 30, 2016. It seeks dismissal of all claims because Plaintiff was not its employee within the meaning of Title VII at any time when the alleged discrimination occurred. According to Defendant, Plaintiff worked three days as an employee before terminating his employment to pursue contract welding work and every alleged act of discrimination, including the alleged wrongful termination, occurred after Plaintiff quit and was merely working as an independent contractor providing welding services. Plaintiff opposes the motion. *See* Pl.'s Resp. (doc. 23); Pl.'s Br. Supp. Resp. (doc. 23-1). Defendant has filed a reply. *See* Def.'s Reply (doc. 26); Def.'s Br. Supp. Reply (doc. 24). The motion is ready for ruling.

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."[5] "As to materiality, the substantive law will identify which facts are material" and a fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a dispute over a material fact qualifies as "genuine" within the meaning of Rule 56. *Id.* Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether to grant summary judgment, the courts view all facts and reasonable inferences drawn from the record "in the light most favorable to party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Nevertheless, once the burden shifts to the nonmoving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The party opposing summary judgment has the burden to come forward with competent summary judgment evidence that shows a genuine factual dispute. *Id.* at 587; *see also*, Fed. R. Civ. P. 56(c). In other words, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient

---

[5]Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Furthermore, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. TITLE VII

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). With exceptions not applicable here, Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). When Congress uses such a circular definition or otherwise does not define employee for a particular statute, the courts resort to common-law agency doctrine to determine whether an individual is an employee under the statute then before the court. *See Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013) (addressing whether a volunteer firefighter qualified as an employee under Title VII).

Under common-law agency principles, the courts "consider the hiring party's right to control the manner and means by which the product is accomplished." *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)). Several factors are relevant to this consideration, including

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

7

*Id.* (quoting *Darden*, 503 U.S. at 323-24).

More particularly, when "determining whether a party is an employee or an independent contractor," courts apply "a variation of the common law agency test," commonly known as the "economic realities/common law control test." *Id.* While this test obviously has two parts, the "court should emphasize" the control portion over the "economic realities portion," which merely "asks whether putative employees, 'as a matter of economic reality, are dependent upon the business to which they render service.'" *Id.* (quoting *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 272 n.3 (5th Cir. 1988)). The emphasized portion, on the other hand, asks "the extent to which the one whom the work is being done has the right to control the details and means by which the work is to be performed." *Diggs*, 847 F.2d at 272. Eleven factors are relevant to the analysis under this test:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated [,] i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"[,] (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Juino*, 717 F.3d at 434-35 (quoting *Diggs*, 847 F.2d at 272-73).

The parties agree that Defendant hired Plaintiff as a floor hand in July 2013. The undisputed evidence also shows, however, that Plaintiff quit that employment after three days and began working as a contractor performing welding duties – first as a subcontractor under Beltran and then on his own under the name KD's Welding. While Plaintiff emphasizes his hiring as a floor hand, he makes no attempt to explain or controvert the evidence that he quit that employment. In addition,

there is no evidence of discrimination against Plaintiff during that three-day period. The Court should find as a matter of law that Plaintiff ceased that employment after three days and that no discriminatory actions took place during that employment period.

Although the facts show Plaintiff working as a contractor, the more pertinent question is whether he should be considered an independent contractor or an employee of Defendant during the period of alleged discrimination. To answer that question, the Court utilizes the previously mentioned economic realities-control test. The first component of this test "has focused on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Deal v. State Farm Cty. Mut. Ins. Co.*, 5 F.3d 117, 119 (5th Cir. 1993). Defendant has paid no salary to Plaintiff while he performed contractor and subcontractor welding services, but it did pay Plaintiff directly for contract welding on a job-by-job basis at an hourly rate. Additionally, Defendant neither withheld taxes nor provided Plaintiff benefits for his welding services. Defendant also did not set the terms and conditions of employment other than offering welding jobs at a particular rig. This component does not favor considering Plaintiff as an employee of Defendant.

Furthermore, under the facts presented, it does not appear that Plaintiff was dependent on welding work from Defendant as a matter of economic reality. Even though work with Defendant may have provided Plaintiff the greatest economic benefit during the relevant time period, the facts also show that he provided welding services to others and continued to provide welding services to others after the ending of his working relationship with Defendant.

Moreover, when determining whether Plaintiff's working relationship with Defendant should be considered employee-employer, the more important inquiry is on the control component, which

focuses "on whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule. *Id.* Defendant had the right to hire and fire Plaintiff for particular welding jobs while he performed contract welding but not when he performed subcontract welding for Beltran and others. Defendant also had no ability to fire Plaintiff from his own welding business, KD's Welding. Furthermore, Defendant had no right to supervise Plaintiff in either his capacity as contractor or subcontractor and had no right to set Plaintiff's work schedule. At all relevant times, Plaintiff could accept or reject welding jobs offered by Defendant and could perform such jobs for others, including competitors of Defendant.

Considering the eleven factors, the Court should find that Plaintiff was an independent contractor and not an employee of Defendant as a matter of law. Welding requires skill and training and is done by a specialist without supervision. Plaintiff furnished his own truck, tools, and equipment, although Defendant provided the place of work when he performed welding services for it. Plaintiff performed welding services for Defendant for the last five months of 2013 and several months in 2014, but he also provided similar services for others and the work for Defendant came through a job-by-job basis. He was paid per job but at an hourly rate whether he worked as a contractor for Defendant directly or indirectly as a subcontractor for Beltran or other contract welders. Defendant ended the working relationship even though Plaintiff wanted it to continue. The only explanation was that Defendant had no work for him. Defendant provided no notice that Plaintiff's services would no longer be used, except perhaps for the slowing of job offers in the last few months before the working relationship completely ended. Plaintiff neither earned annual leave nor accumulated retirement benefits during his working relationship with Defendant. Plaintiff paid his own taxes, including social security taxes. Although Defendant had a welding boss, as Plaintiff

characterized Plew, welding work was a peripheral, rather than integral, part of Defendant's business. Finally, Defendant has directly stated that it intended Plaintiff to work as an independent contractor. Not only does the facts support that intent, but the facts also show that Plaintiff intended to be on his own where he could accept or reject work projects and provide welding services for others as opportunities arose. The facts indicate that Plaintiff also intended to be an independent contractor.

Plaintiff contends that he is an employee because Plew asked him to do welding services at his orientation and went with him to introduce him to Beltran. While relevant, those facts do not make him an employee under the economic realities-control test. The facts show that Plaintiff quit his three-day employment with Defendant, became a subcontractor under Beltran until Plaintiff obtained his own liability insurance, and he then began providing contract welding services directly to Defendant. Plew's involvement with connecting Plaintiff to Beltran does not make Plaintiff an employee of Defendant.

Plaintiff also contends that Defendant exerted control over him by requiring that he take a drug test before Plew would give him work. However, Plaintiff suggested the drug test after being accused of being on drugs and he took the test, although "as a contractor, [he did not] have to," and while "willing to cooperate to keep [his] work going," that willingness did not make him "an employee." Pl.'s Dep. 78, 80. Plaintiff conceded that he was "not required to do a drug test." *Id.* 80. These facts do not rise to the level of control sufficient to transform an independent contractor into an employee.

Plaintiff cites to three cases arising under the Fair Labor Standards Act ("FLSA") to support finding him to be an employee of Defendant. *See* Pl.'s Br. 11 (citing *Robicheaux v. Radcliff*

*Material, Inc.*, 697 F.2d 662, 666-67 (5th Cir. 1983); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308 (5th Cir. 1976); *Hager v. Claiborne Cty. Med. Ctr.*, No. 5:14-CV-106-KS-MTP, 2016 WL 205422, 2016 U.S. Dist. LEXIS 5419 (S.D. Miss. Jan. 15, 2016)). However, those cases are distinguishable on their facts. As recognized in *Hager*, "whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." 2016 WL 205422 at *2 (quoting *Thibault v. BellSouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010)). After conducting the economic realities-control analysis under the facts of this case, the Court should not be persuaded that the cases cited by Plaintiff warrant finding him to be an employee at the time of any alleged act of discrimination.

Given this analysis of the relevant factors, the Court should find, as a matter of law, that Plaintiff was not an employee of the Defendant at any time relevant to the alleged discrimination. In such circumstances, the Court properly dismisses Title VII claims with prejudice. *See Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 439-40 (5th Cir. 2013). Without an employee-employer relationship, there is no legal basis for a discrimination claim under Title VII. The Court should grant the motion for summary judgment and dismiss the claims against Defendant.

## IV. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court **GRANT** Defendant's No-Evidence and Traditional Motion for Summary Judgment (doc. 21) and **DISMISS** the claims asserted against Defendant. In light of the recommended dismissal, the undersigned directs the Clerk of Court to reassign this case to Senior District Judge Sam R. Cummings in accordance with the Second Amended Special Order No. 3-301.

A copy of this Report and Recommendation shall be served on all parties in the manner

provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

    **SO ORDERED this** _17_ **day of April, 2017.**

                                                 **E. SCOTT FROST**
                                               **UNITED STATES MAGISTRATE JUDGE**